IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


DAVID MARTIN PYLE                                                        PLAINTIFF

             v.                    Civil No.  5:15-CV-05245

HEAD NURSE ROBIN SIMS, NURSE
JUDY MADEWELL, ANDREW PIAZZA (nurse), and
NURSE PHEBE GROTHAUS                                                   DEFENDANTS


**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

At all times relevant to the complaint, Plaintiff was incarcerated in the Washington

County Detention Center (WCDC).  Plaintiff is currently not incarcerated.

Plaintiff contends his constitutional rights were violated when an error concerning his

prescribed dosage of the anti-psychotic drug Quetiapine was made by unknown medical

personnel on his Medical Administration Record (MAR).  Specifically, the dosage was changed

from the maximum safe dose of 800 mg per day to 1600 mg per day.  (Doc. 1, pp. 5-8).  Plaintiff

also contends actions taken by Southern Health Partners (SHP) medical staff in response to that

error also violated his constitutional rights.  (Doc. 1, pp. 6-8).  Defendants filed a partial motion

to dismiss Plaintiff's official capacity claims.  (Doc. 9).  This motion was granted on March 14,

2016.  (Doc. 13).  Defendants have filed a motion for summary judgment regarding the

remaining individual capacity claims.  (Doc. 19).  Plaintiff has filed a written response.[1]  (Doc. 22).  The Court requested and received two summary judgment supplements from Defendants. (Docs. 27, 30)  Plaintiff responded to the first supplement.  (Doc. 28).  Plaintiff did not respond to the second supplement.  Defendants filed an additional affidavit from a non-party on January 25, 2016.  (Doc. 32).  The motion is ready for decision.

## 1.  Background

In his complaint, Plaintiff alleges that on or about August 1, 2015,  SHP medical staff gave him the wrong dosage of Seroquel (Quetiapine).  Specifically, he alleges the prescribed dose was 400 mg twice daily, and he was given 800 mg twice daily. (Doc. 1, p. 5).  He alleges this occurred for approximately thirty days.  He further alleges that when the mistake was discovered, SHP medical staff abruptly cut his dosage back to the correct dosage without giving his body and mind time to adjust.  (Doc. 1, p. 5).  Plaintiff alleges this made him immune to the prescribed amount.  (Doc. 1, p. 6).

Plaintiff alleges he saw Nurse Madewell about his conditions after the medication dosage was reduced back to a total of 800 mg per day.  He alleges that she ignored his requests to speak to a physician, and instead told him to "work on his coping skills."  (Doc. 1, p. 7).  He alleges Nurse Robin Sims[2] is the head nurse and was aware of the staff mistake.  He further alleges she

_____

[1]Plaintiff was initially thought to be unincarcerated, and was scheduled to appear in person for a summary judgment hearing on September 22, 2016.  (Doc. 14).  On the day of the hearing, it was discovered that Plaintiff was actually incarcerated in the ADC.  The hearing was cancelled, and it was determined Plaintiff's written response was sufficient for the purposes of ruling on the summary judgment motion. (Doc. 24).

[2]Documents submitted by Defendants indicate the correct spelling of Nurse Robin Sims name is Robyn Sims.

is "responsible for the actions of the staff working under her," but permitted them to ignore his requests to fix this issue.[3]  He alleges she is involved in staff attempts to cover up the mistake concerning his medication.  (Doc. 1, p. 8).

Plaintiff seeks compensatory and punitive damages, mental compensation, and "to make sure this misconduct doesn't happen in the future."  (Doc. 1, p. 12).

Defendants filed their summary judgment motion on August 8, 2016.  (Doc. 19).

In his response to the summary judgment motion, Plaintiff stated he "never claimed any physical issues" due to the Quetiapine overdose.  (Doc. 22, p. 1).  Rather, he states the high dosage and abrupt cessation down to the correct dosage left him with mental issues as a schizophrenia patient.  (Doc. 22, p. 1).  In the first page of the response, he states he received the overdose for thirty days.  (Doc. 22, p. 1).  Later in the response he states that Defendants' Exhibit 1-d (September MAR) indicates he received the overdose for twenty seven days, as opposed to the five days claimed by Defendants.  (Doc. 22, p. 2, 4).  He repeated that this caused mental issues, not physical issues.  (Doc. 22, p. 2).  Plaintiff stated Defendants' Exhibit 1-g (Plaintiff's medical progress notes) shows that he complained of hearing voices after his dosage was reduced, and was told to work on his coping skills.  (Doc. 22, p. 2).  Plaintiff also questions the inability of Defendants to determine who made the clerical error which resulted in the overdose.  (Doc. 22, p. 3).

---

[3]It is not clear from the Complaint whether Plaintiff is referring to the initial mistake or the subsequent reduction of his medication and alleged issues arising from that reduction. However, in his response to an interrogatory he stated Sim's failure to properly oversee the nursing staff resulted in the overuse of prescribed medications.  The Court will therefore interpret his complaint against Sims to refer to the initial mistake.

-3-

### 2.  Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." <u>National Bank of Commerce v. Dow Chemical Co.</u>, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." <u>National Bank</u>, 165 F.3d at 607 (<u>citing Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." <u>Id.</u> (<u>citing Metge v. Baehler</u>, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3.  Discussion

Defendants have moved for summary judgment on the following grounds: (1)  Defendants were not deliberately indifferent to Plaintiff's serious medical needs; (2) Defendant Sims is not

-4-

liable to Plaintiff based on the a theory of *respondeat superior*; and (3) Plaintiff cannot meet proof with proof to show a genuine issue of material fact.  (Doc. 20, pp. 5-9).

## A.  No Actual Physical Injury

As a preliminary matter, the Court notes Plaintiff stated he suffered no physical effects as a result of the overdose and any subsequent actions or inactions by Defendants after the overdose was discovered.  (Doc. 22, pp. 1-2).  Rather, he states he only suffered mental issues. (Doc. 22, pp. 1-2).

Section 803(d) of the PLRA provides as follows:  "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ."  42 U.S.C. A. § 1997e(e) (West, WestlawNext through Pub. L. No. 114- 254, approved March 7, 2013.)  Furthermore, "[c]laims under the Eighth Amendment require a compensable injury to be greater than *de minimis*."  Irving v. Dormire, 519 F.3d 441, 448 (8th Cir. 2008).

The PLRA therefore limits the available damages in the absence of a physical injury but does not preclude a Plaintiff from pursuing a claim.  See Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004) (The physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners" but does not bar the recovery of nominal and punitive damages); see also Pool v. Sebastian County, 418 F.3d 934, 942 n.2 (8th Cir. 2005) (Section 1997e(e) presents an issue of damages under the PLRA).

The Court could find no case law indicating that the worsening of mental or emotional symptoms, alone, qualifies as a compensable physical injury.  A survey of all circuits indicated symptoms such as anxiety, sleeplessness, and hallucinations, even if considered to have some

AO72A
(Rev. 8/82)

physical manifestation or component, do not pass the *de minimis* injury hurdle.  See e.g. Edler v. Hockley County Comm'rs Court, 589 Fed. App'x 664 (5th Cir. 2014) (delerium tremors from alcohol withdrawal, with no medication and with inmate waking up bloody not frivolous; however, claims for denial of mental health and mental retardation care not actionable without physical injury); Amick v. Ohio Dept. of Rehab. and Corr., 521 Fed. App'x 354 (6th Cir. 2013) (discontinuation of antipsychotic drugs, which ultimately resulted in  increased symptoms and death in a fight, did not meet objective component of deliberate indifference because inmate did not report symptoms for five months after discontinuation); Chatham v. Adcox, 334 Fed. App'x 281 (11th Cir. 2009) (when inmate was repeatedly "crashed" from his Xanax, the resulting anxiety, nightmares, and hallucinations did not rise to a level of a physical injury  that was greater than *de minimis*; he was also being given other psychotropic drugs); Baker v. Pettis Cnty. Jail, No. 06-4092-CV-C-NKL, 2007 WL 4289693 (W.D. Mo. Nov. 28, 2007) (denial/delay of anti-psychotic drugs to inmate was mere disagreement over diagnosis, and  his unsupported allegation that he suffered extreme mental anguish is insufficient to support a claim).

Because Plaintiff has not alleged any actual physical injury in this case, *de minimis* or otherwise, he is not eligible to pursue compensatory damages.  Plaintiff did, however, request punitive damages.  Assuming a plaintiff can show the existence of a constitutional violation, punitive and nominal damages are available under the PLRA even in the absence of a physical injury.  Royal, 375 F.3d at 723-24.  Nominal damages are available to vindicate a violation of rights with no actual injury. Id. at 724.   Punitive damages are available only when a "'defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference'" to protected federal  rights.'" Id. (quoting Smith v. Wade, 461

AO72A
(Rev. 8/82)

U.S. 30, 56 (1983)).  Thus, the Court must determine if Plaintiff has sufficiently alleged the constitutional violation of deliberate indifference to his serious medical needs in order to determine if his case may proceed as to nominal and punitive damages.

### B.  Deliberate Indifference to Serious Medical Needs

Plaintiff raised three possible instances of deliberate indifference to his medical needs: (1) the initial error on his August MAR which changed his dose of Quetiapine from 800 mg per day to 1600 mg per day; (2) the abrupt decrease of his Quetiapine from 1600 mg back to 800 mg when the error was discovered; and (3) Defendant Madewell's alleged failure to provide treatment options to him when he complained of auditory hallucinations on September 30, 2015, telling him instead to work on his coping skills.

Defendants argue there was no deliberate indifference for the following reasons: (1) the error on the August 2015 MAR was inadvertent, was entered by an unknown member of the medical staff, and was promptly corrected on August 5, 2016, when it was discovered; (2) Defendants Madewell and Sims are Registered Nurses, and Defendants Piazza and Gothaus are Licensed Practical Nurses, and as nurses cannot prescribe drugs or modify prescriptions;  (3) neither Nurse Sims, as Medical Team Administrator, or Nurse Madewell had any knowledge of the overdose until sometime after August 5, 2015; (4) Plaintiff was administered the increased dosage of Quetiapine as a result of the misreading of a prescription, which does not rise to the level of an Eighth Amendment violation.  (Doc. 20)

To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  The deliberate indifference standard includes "both an objective and a subjective

AO72A
(Rev. 8/82)

component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that he suffered from an objectively serious medical need Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted). There is no dispute that Plaintiff's schizophrenia is a serious medical need which satisfies the first prong of the test.

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Correctional Med. Servs, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).

Further, it is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010) (internal quotation marks and citations omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." Id. Despite this, issues of fact exist when there is a

-8-

question of whether or not medical staff exercised independent medical judgment and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference.  See Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990).

### i.  Initial Quetiapine Dosage Error

There is no dispute that Plaintiff recieved an incorrect dose of Quetiapine starting on August 1, 2015.  Defendants state the overdose was corrected as of August 5, 2015.  (Doc. 20, p. 6).  In his response, Plaintiff first states  he received the overdose for thirty days, and then states Defendants' Exhibit 1-d (September MAR) shows that he received the overdose for twenty-seven days.  Specifically he notes the September MAR had 400 mg at one part of the prescription, but 800 mg twice a day in another portion.  He notes the handwritten correction returning it to the proper dose. (Doc. 22 ).

After a thorough review of the medical record and all submissions by the parties,  the Court finds Plaintiff's allegations concerning the length of time he received the overdose are contradicted by the record.  According to the affidavit of Nurse Sims, the detention center pharmacy prints an MAR for the coming month.  A member of the nursing staff then reviews the MAR. (Doc. 27-1, p. 1).  The MARs have a column on the left indicating the drugs and dosages for the inmate.  For each drug there is a row where initials are to be placed to indicate who gave the medication on each day.  The MARs for June and July of 2015 indicate Plaintiff was to take two 200 mg tablets, a total of 400 mg, twice daily, for a total daily dose of 800 mg.  (Doc. 20-1, pp.6-7).  In the August MAR, the typewritten 200 mg and 400 mg amounts are crossed out and 800 mg is handwritten in the left column.  This resulted in Plaintiff receiving 800 mg of Quetiapine twice a day, for a total daily dose of 1600 mg.  A handwritten notation in the

-9-

administration row of the MAR indicates the Quetiapine was discontinued on August 5, 2015, and a new notation in the left column underscores the amount of 400 mg to be given twice a day and is also dated August 5, 2015.  (Doc. 20-1, p. 6 ).  In the September MAR, the typewritten dosage is 400 mg, two tablets twice a day.  However, the two tablet portion is crossed through, thus reflecting the correct daily dosage of 800 mg.  There are no notations in the administration row of the September MAR indicating any changes.  It, therefore, appears that the correct dosage was administered throughout the month of September.

Dr. Saez provided an affidavit stating he corrected the prescription on August 5, 2015. (Doc. 30-1).  Plaintiff's August MAR and the affidavit of Dr. Saez, who discontinued the prescription, clearly state the overdose was discontinued on August 5, 2015.  Further, his allegation concerning the September MAR is not supported by the MAR itself, as the MAR shows the 800 mg notation was corrected, and there is nothing in the administration row to show any changes during the month, as there were with the August MAR. Thus, the medical record indicates a dosage error was present when the new MAR was run in September, but that error was corrected before Plaintiff received any medication under it.  Further, as discussed below, in the absence of actual physical injury, the length of time he received the overdose is not material to the deliberate indifference analysis.

The Court is troubled by the fact that Defendants have been unable to identify the individual responsible for the initial dosage error, despite numerous affidavits in the summary judgment motion and summary judgment supplements.  However, based on the affidavits provided by Defendants in their supplement, it is clear that none of the named Defendants in this case were responsible for the error.  (Docs. 20-2, 20-3, 20-4, 27-1, 27-2, 30-2, 30-3, 30-4).  Further, even

-10-

if one of the named Defendants had been responsible for the dosage change,  Plaintiff has not

provided sufficient evidence to show that the action rose to the level of deliberate indifference.

"Grossly incompetent or inadequate care can constitute deliberate indifference in

violation of the Eighth Amendment where the treatment is so inappropriate as to evidence

intentional maltreatment or a refusal to provide essential care." Dulany, 132 F.3d at 1240-41

(8th Cir. 1997).  A medication error alone, as to either the type or dose of medication, is not

deliberate indifference.  It is, at most, medical malpractice, which is not actionable under § 1983.

See Phillips v. Jasper Cnty. Jail, 437 F.3d 791, 795 (8th Cir. 2006) (prescribing both the wrong

type and dose of an anti-seizure medication to an inmate was malpractice but not deliberate

indifference); Jolly, 205 F.3d 1094, 1096-97  (increasing dosage of medication, even to toxicity

level, was not deliberate indifference); Dulany, 132 F. 3d at 1240-41 (administration of lithium

to an inmate without testing, which resulted in blood levels exceeding the recommended

standard, was not grossly innapropriate or evidence of intentional maltreatment); Hutchinson v.

Wexford Health Services, Inc., 638 Fed. App'x. 930, 933 (11th Cir. 2016), cert. denied, 137 S.

Ct. 70 (2016) (no evidence that "lost documents, inadequate explanations of medications,

incorrect medications, and delayed medication caused harm to him"); Woolford v. McDonald,

61 F. Supp. 3d 454, 460 (D. Del. 2014) ("The alleged instances of the CCS defendants' failure

to provide plaintiff his anti-rejection medication for his kidney transplant or administration of

incorrect doses of his medication, even if true, are indicative of nothing more than negligence

on the part of the medical providers."); Callaway v. Smith Cnty., 991 F. Supp. 801, 809 (E.D.

Tex. 1998) (Plaintiff's failure to receive AIDS medication the first five days of jail, and then only

half the dosage for another fifteen days, which Plaintiff characterized as a mistake, was simple

-11-

mistake or negligence rather than deliberate indifference). <u>Compare</u> <u>Barnett v. Luttrell</u>, 414 Fed

App'x 784, 788 (6th Cir. 2011) (when nurse incorrectly administered anti-seizure medication

rather than pain medication, causing inmate to fall and sustain a head injury, the medication error

was nonactionable malpractice, but her abandonment of him after his fall was actionable);

<u>Varricchio v. Cnty. of Nassau</u>, 702 F. Supp 2d 40, 58-59 (E.D.N.Y. March 17, 2010) (incorrect

administration of two medications to inmate due to county policy of not labelling medications

resulted in extreme changes in heartrate sufficient to plead a claim).

Taking Plaintiff's allegations and characterizations as true, the initial error in his

Quetiapine dosage was a simple mistake which was promptly corrected when discovered.

Plaintiff has provided no allegation or facts which would permit an inference of intentional

maltreatment or refusal to provide essential care. At most, the error was medical malpractice,

which is not actionable under §1983. Plaintiff has therefore failed to produce or allege any

summary judgment evidence that the initial Quetiapine dosage error rose to the level of

deliberate indifference.

### ii.  Correction of Overdose

There is no dispute that the Quetiapine dosage error was corrected by immediately

reducing the dosage from 1600 mg per day to 800 mg per day when it was discovered. Plaintiff

argued this resulted in his Quetiapine dosage becoming less effective because his body had

become immune to the maximum safe dose. None of the named Defendants were responsible

for the decision to reduce the dosage, as it was Dr. Saez who made the decision. (Doc. 30-1).

Further, as correctly argued by Defendants, the Defendants are all nurses, and, as such do not

have the authority to write or modify prescriptions.  (Doc. 20, p. 7).

Dr. Saez was the physician who made the decision to immediately reduce Plaintiff's dosage when the error was discovered.  In his affidavit, he stated he gave the order to reduce Plaintiff's dosage to 800 mg per day on August 5, 2015.  His reasons for doing so were as follows:

> My reasoning for immediately correcting the dosage to 800 mg per day is based on several factors.  The maximum recommended dose for Quetiapine is 800 mg per day.  I did not believe it prudent to knowingly continue administering Quetiapine to a patient in an amount that exceeds the maximum recommended daily dose.  Continued administration of doses that exceed the maximum recommended dose can lead to acute overdose.  The Physician's Desk Reference states that, the safety of doses in excess of 800 mg per day have not been evaluated.  Therefore the potential risks associated with continuing to administer doses in excess of the maximum recommended amount outweighed any risk of decreasing the dosage to 800 mg per day.

(Doc. 30-1).  Dr. Saez further stated he made adjustments to Plaintiff's anti-anxiety and anti-depressant medications to maintain more uniform levels in his bloodstream and better control of anxiety when he reduced his Quetiapine dosage.  (Doc. 30-1).  Based on Dr. Saez's affidavit, it is clear that it was not deliberate indifference to immediately reduce Plaintiff's dosage in order to avoid an acute overdose.  Indeed, failure to do so might well have constituted deliberate indifference.  According to the Physician's Desk Reference, overdose side effects in clinical trials included drowsiness and sedation, tachycardia (rapid heart beat), hypotension (decreased blood pressure), hypokalemia (potassium deficiency), and first-degree heart block.  Post - marketing reports of overdose side effects included coma and death.  (Doc. 20-5).  Further, Dr. Saez explicitly weighed the risks of immediately reducing the dosage versus continuing to prescribe a medication at a dose well over the maximum safe limit.  That Plaintiff disagreed with

-13-

this decision is not actionable.

Plaintiff has therefore failed to provide any evidence of deliberate indifference based on the abrupt reduction of his dosage back to the maximum safe dose once the error was discovered.

### iii.  Interaction with Nurse Madewell

This leaves Plaintiff's allegations against Nurse Madewell.  Plaintiff alleges he spoke with Madewell about mental issues after the overdose and asked to speak to a medical doctor. Plaintiff alleges she only told him to work on his coping skills.  (Doc. 1, p. 7).  Plaintiff's medical records show he saw Madewell on August 18, 2015 and September 30, 2015.  (Doc. 20-1, p. 10).  On August 18, 2015, the notes indicate Plaintiff reported his Quetiapine was effective, and denied auditory or visual hallucinations.  He did report anxiety.  Madewell added him to the list to see the medical doctor.  On September 30, 2015, the notes indicate Plaintiff reported he was taking an increased dose of Seroquel (Quetiapine) and now that it has been cut in half, he is having auditory hallucinations.  Madewell notes she "encouraged coping skills."  Plaintiff stated he did not have any coping skills, and demanded the medical doctor.  The notes then indicate Plaintiff "pushed over his chair and anger, walked out cussing."  (Doc. 20-1, p. 10) Madewell's affidavit of January 13, 2017, admits telling Plaintiff to work on his coping skills, but also provides additional context to the medical report.  She stated she saw Plaintiff on August 18, 2015 to assess his mental health needs.  At this point he had been on the reduced dose of Quetiapine for thirteen days.  Plaintiff reported no auditory or visual hallucinations, but did report anxiety.  She reported this to Dr. Saez, and he made adjustments to Plaintiff's anxiety and anti-depression medications.  Her statement concerning the September 30, 2015, exam is as follows:

-14-

> I met with David Pyle again on September 30, 2015, at which
> time he reported taking increased Seroquel (Quetiapine), and
> since it was cut in half he reported hearing voices. Because it had
> been nearly two months since his Quetiapine dose was reduced,
> I did not believe there was a correlation. When I suggested that
> David Pyle should work on his coping skills, he became angry,
> pushed over his chair, and ended the session by cursing and
> walking out. Because he walked out of the session there was no
> opportunity to explore with him any other treatment options.

(Doc. 30-4, p. 2). Nurse Madewell also noted Plaintiff was released from the WCDC on or about October 5, 2015. (Doc. 30-4, p. 2). Thus, Plaintiff's allegations that he was denied medical care by Nurse Madewell are contradicted by the record, as he terminated the session before other treatment options could be explored. He was then released from the WCDC a few days later.

Plaintiff has failed to produce any summary judgment evidence to show the constitutional violation of deliberate indifference to his serious medical needs. Because he failed to do so, Plaintiff is not eligible to pursue a claim for nominal or punitive damages for his deliberate indifference claim. Defendants are entitled to judgment in their favor. In view of this, the Court need not address the Defendants' other arguments in favor of summary judgment.

### 4. Conclusion

For the reasons stated, I recommend that Defendants' summary judgment motion (Doc. 19) be **GRANTED** and this case **DISMISSED with prejudice.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review**

-15-

**by the district court.**

DATED this 30th day of January, 2017.

/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-16-

AO72A
(Rev. 8/82)